## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| MABREY BANCORPORATION, INC., AND | ) | |
| MABREY BANK, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:19-cv-00571-RJS-JFJ |
| | ) | |
| EVEREST NATIONAL INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT

This case concerns whether Defendant Everest National Insurance Company (Everest) must cover Plaintiffs Mabrey Bancorporation and Mabrey Bank (collectively Mabrey) under a financial institution bond (the Policy) Everest issued.  Mabrey brought this action alleging Everest breached its obligations under the Policy by refusing to indemnify Mabrey for certain losses.[1]  Now before the court is Mabrey's Motion for Summary Judgment,[2] Everest's First Motion for Summary Judgment,[3] and Everest's Supplemental Motion for Summary Judgment.[4] For the following reasons, Mabrey's Motion for Summary Judgment is DENIED, and Everest's Supplemental Motion for Summary Judgment is GRANTED.  Everest's First Motion for Summary Judgment is DENIED as moot.

---

[1] ECF 5, *Complaint* ¶ 19.

[2] ECF 39.

[3] ECF 46.

[4] ECF 61, *Everest's Supplemental Motion for Summary Judgment and Supplemental Response in Opposition to Plaintiffs' Motion for Summary Judgment* (Everest's Supplemental Motion for Summary Judgment); ECF 62, *Brief in Support of Everest's Supplemental Motion for Summary Judgment*.

**BACKGROUND**

This matter arises from a coverage dispute between an Oklahoma bank, Mabrey, and its insurer, Everest.  Mabrey owns multiple Automatic Teller Machines (ATMs) which dispense cash using debit or credit cards.[5]  In 2018, thieves made multiple unauthorized withdrawals from Mabrey ATMs using counterfeit cards.[6]  After learning about the fraud scheme, and its liability for the losses from its ATMs, Mabrey filed a claim with Everest.[7]  Everest denied coverage for the claim.[8]  Mabrey then brought this suit, alleging Everest breached its obligation to indemnify Mabrey under the Policy.

The court will first address each party's response to the statements of fact set forth in the summary judgment briefing and resolve objections therein.  Then, the court will set forth the factual record for purposes of summary judgment.

## I.    Objections to Statements of Facts[9]

The court will first address Everest's objections to Mabrey's statement of facts, and next address Mabrey's objections to Everest's statements of facts.

---

[5] ECF 39 at 5.

[6] *Id.* at 6–7.

[7] ECF 39 at 8; ECF 46 at 7.

[8] ECF 39 at 8; ECF 46 at 10.

[9] Everest's objections under Local Rule 56-1 do not conform to the Rule's requirement that it "begin with a section responding, *by correspondingly numbered paragraph*, to the facts that the movant contends are not in dispute." LCvR 56-1(c) (emphasis added).  Likewise, Mabrey did not abide by Local Rule 56-1 in objecting to Everest's Supplemental Statement of Facts.  Pursuant to Rule 56-1, all material facts set forth by the movant are "deemed admitted for the purpose of summary judgment unless specifically controverted by . . . the opposing party, using the procedures set forth in this rule." *Id.*  Nonetheless, the court will review and respond to both parties' objections on their merits.

### a.  Everest's Objections to Mabrey's Statement of Facts

**Objection to Fact 3**

Everest objects to "Mabrey's description of the coverage provided by Insuring

Agreement (B)."[10]  This objection is sustained.  The parties do not dispute the language of the

Policy, only its interpretation and application to the claimed loss.  Therefore, for purposes of

summary judgment, the court will refer directly to the language of the Policy rather than to either

party's paraphrasing.[11]

**Objection to Fact 4**

Everest objects to "Mabrey's statement that the [Policy's] 'Covered Property' section

provides coverage to Mabrey."[12]  This objection is sustained.  Neither party argues the Covered

Property provision creates coverage for the claimed loss where none would otherwise exist.[13]

Rather, the parties agree the Covered Property provision enumerates categories of property to

which the Policy may apply.[14]

**Objection to Fact 5**

Everest objects to "Mabrey's description of the coverage provided by the ATM Rider."[15]

This objection is overruled as it does not contradict Mabrey's quote of the Policy language.[16]

The parties do not dispute the language of the Policy, only its interpretation and application to

---

[10] ECF 45, *Everest's Response in Opposition to Mabrey's Motion for Summary Judgment* at 5; ECF 39 at 6.

[11] *See* ECF 39-3, *The Policy* at 3.

[12] ECF 45 at 6; ECF 39 at 6.

[13] *See* ECF 46 at 17–18; ECF 50, *Mabrey's Response in Opposition to Everest's First Motion for Summary Judgment* at 7.

[14] ECF 50 at 7; ECF 53, *Everest's Reply Brief in Support of its First Motion for Summary Judgment* at 10.

[15] ECF 45 at 6; ECF 39 at 6.

[16] *See* ECF 45 at 6; ECF 39 at 6; ECF 39-3 at 51.

the claimed loss.  Therefore, for purposes of summary judgment, the court will refer to the language of the Policy directly.[17]

**Objection to Fact 15**

Everest objects to Mabrey's statement that its "loss totaled $342,080.00."[18]  This objection is overruled.  The total amount of the claimed loss is not material to the question presented for summary judgment: whether Mabrey's claim of loss is covered under the Policy.

The remainder of Everest's objection does not state a factual objection, but rather sets forth Everest's legal argument for denying coverage of the claimed loss.[19]  To the extent this objection seeks to make Everest's legal argument part of the factual record for summary judgment, it is overruled.

**Objection to Fact 14**

Everest objects to "Mabrey's assertion that it first discovered the loss on December 17, 2018, when TransFund . . . notified Mabrey that it would be responsible for numerous unauthorized transactions involving the use of counterfeit debit cards."[20]  To the extent Everest objects to the implication that discovery of loss occurred on December 17, 2018, the objection is sustained.

However, to the extent the objection proceeds to insert Everest's legal argument that "it is undisputed that discovery of loss occurred on October 15, 2018" it is overruled.[21]  The court will not import either party's legal arguments to the factual record for summary judgment.

---

[17] *See* ECF 39-3 at 51–52.

[18] ECF 45 at 6–7; ECF 39 at 7.

[19] ECF 45 at 7.

[20] *Id.* at 7; ECF 39 at 7.

[21] ECF 45 at 7.

**Objection to Fact 16**

Everest objects to "Mabrey's assertion that it notified Everest of its alleged loss at the earliest practicable moment, not to exceed sixty (60) days after discovery of loss."[22]  This objection is not directed to any fact in Mabrey's statement of facts, but rather cites to Mabrey's legal argument in its Motion for Summary Judgment.[23]  Therefore, the objection is overruled.

While Everest cites to Mabrey's Fact No. 16 later in this objection, it concedes the fact that "[o]n January 17, 2019, Everest was notified of a potential insurance claim."[24]  To the extent this paragraph purports to object to Mabrey's Fact No. 16 it is overruled.

The remainder of the objection sets forth Everest's legal argument that notice was untimely.[25]  To the extent this objection seeks to make a party's legal argument part of the factual record for summary judgment, it is overruled.

**b.  Mabrey's Objections to Everest's First Statement of Facts**

**Objection to Fact 3**

Mabrey objects to the assertion that "[o]n October 15, 2018, Mabrey learned of unauthorized debit card transactions at its South Tulsa Branch and reported them to the Tulsa Police Department."[26]  Mabrey states that Security Operations Officer Tony Huerta clarified in his Amended Affidavit that "loose withdrawal slips were initially reported to him on September 20, 2018."[27]  This objection is sustained.

---

[22] *Id.* at 7–8.

[23] *Id.* (citing to ECF 39 at 14).

[24] ECF 39 at 8; ECF 45 at 8 ("Everest was first notified of the alleged loss on January 17, 2019."); ECF 44, *Everest's First Amended Answer* ¶ 9 ("Everest admits that by email to ABA Insurance Services dated January 17, 2019, Mabrey notified Everest of a potential claim.").

[25] ECF 45 at 8.

[26] ECF 46 at 6; ECF 50 at 1–2.

[27] ECF 50 at 2.

Considering Mr. Huerta's Amended Affidavit,[28] and the dates included in the Tulsa Police Department Incident Report indicating suspicious transactions dating as early as September 17, 2018,[29] the court will consider for purposes of summary judgment that "Mabrey learned of unauthorized debit card transactions at its South Tulsa Branch on September 20, 2018, and reported them to the Tulsa Police Department."

**Objection to Fact 6**

Mabrey objects to the assertion that "in January 2019 [Mabrey] learned from its third-party vendor, TransFund . . . that Mabrey was responsible for the unauthorized withdrawals due to a 'liability shift.'"[30]  Mabrey asserts it first received notice from TransFund on December 17, 2018.[31]

The question of when Mabrey learned it was responsible for the unauthorized withdrawals due to the liability shift is material to the issues of when discovery of loss occurred and whether notice was timely.  Mabrey's objection is sustained to the extent it clarifies that on December 17, 2018, Mary Radkin of TransFund emailed Mabrey's executive officers regarding the value of Mabrey's ATM liability shift losses for September through November 2018.[32] However, to the extent the objection implies discovery of loss occurred on December 17, 2018, it is overruled.

---

[28] ECF 50-1 at 1.

[29] ECF 39-6 at 1–4, 23–38.

[30] ECF 46 at 6.

[31] ECF 50 at 2.

[32] *See* ECF 39-2, *Email from Mary Radkin* at 1.

**Objection to Fact 7**

Mabrey objects to the assertion that "its loss results from the liability shift."[33]  Mabrey

asserts its loss was "due to the thefts from its ATM, which Mabrey learned it would be

responsible for under the liability shift."  To the extent this objection clarifies the loss of money

from the ATM occurred because of the cash-out scheme and Mabrey was responsible for the loss

of money because of the liability shift with TransFund, it is sustained.

**Objection to Fact 13**

Mabrey objects to Everest's statement that "the loss from withdrawals at [one of

Mabrey's] ATM[s] cannot qualify for coverage under Insuring Agreement (B)'s On Premises

coverage, which requires the ATM that is accessed be located on Mabrey's premises."[34]  Mabrey

argues this states Everest's conclusion, rather than an undisputed fact.[35]  The court agrees and

sustains Mabrey's objection on that basis.  Moreover, the existence of coverage under Insuring

Agreement (B) is not material to the court's holding.

**Objection to Fact 16**

Mabrey objects to Everest's statement that "[t]he Covered Property provision is not an

insuring agreement."[36]  Mabrey asserts the statement is a conclusion and implies the provision is

not relevant to the case.  This objection is overruled.

Whether or not the Covered Property provision is an insuring agreement is immaterial to

the issues raised on summary judgment.  Neither party argues the provision creates coverage for

---

[33] ECF 46 at 7.

[34] *Id.* at 8; *see also* ECF 50 at 2.

[35] ECF 50 at 2.

[36] ECF 46 at 9; ECF 50 at 2.

the claimed loss.[37]  Rather, the parties agree the Covered Property provision enumerates categories of property to which the Policy may apply.[38]  The parties present only cursory arguments regarding whether the money stolen from Mabrey's ATMs was "covered property" within the enumerated categories, [39] and that issue is not relevant to the court's holding.

### c.  Mabrey's Objections to Everest's Supplemental Statement of Facts
**Objection to Facts 15–18**

Mabrey objects on the basis that the "date when Mabrey's executive officers were made aware of the thefts or incident reports is not material for purposes of when Mabrey was required to give notice of the loss, because (1) indisputably, Everest did not suffer any prejudice due to any possible delay in receiving notice and (2) notice is tied to awareness of a loss covered by the Policy, not when Mabrey first learned about possible thefts."[40]

This objection is overruled.  The question of when Mabrey's executive officers learned facts related to the claimed loss, including information concerning possible thefts, the cash-out scheme, and the liability shift, is material to determining when discovery of loss occurred and the related issue of whether notice was timely.[41]  To the extent Mabrey objects on grounds that Everest must prove it was prejudiced by possibly late notice, or that discovery of loss is unrelated to when Mabrey learned of the thefts, the objection incorporates Mabrey's legal arguments.  The court will not import either party's legal arguments to the factual record for summary judgment.

---

[37] *See* ECF 46 at 17–18; ECF 50 at 7.

[38] ECF 50 at 7; ECF 53 at 10.

[39] *See, e.g.,* ECF 39 at 11; ECF 45 at 17; ECF 49, *Mabrey's Reply in Support of its Motion for Summary Judgment* at 2; ECF 46 at 17–18; ECF 50 at 7; ECF 53 at 10.

[40] ECF 64, *Mabrey's Response in Opposition to Everest's Supplemental Motion for Summary Judgment* at 3.

[41] *See, e.g.*, ECF 39 at 13–15; ECF 45 at 17–21; ECF 49 at 3–5; ECF 62 at 8–11; ECF 64 at 5–8; ECF 65, *Everest's Reply in Support of its Supplemental Motion for Summary Judgment* at 2–5.

**Objection to Facts 8–10**

Mabrey objects that these facts "do not accurately reflect the total amount of loss," which it asserts is $342,080.00.[42]  However, the total amount of loss is not material to the question presented for summary judgment: whether Mabrey's claim of loss is covered under the Policy. This objection is overruled.

## II.    Factual Record for Summary Judgment

At summary judgment, the court reviews the parties' agreed-upon factual record and draws reasonable inferences therefrom in favor of the nonmovant.[43]  The following facts are not in genuine dispute and are drawn from the parties' summary judgment briefing and attached affidavits and exhibits.[44]  They are admitted into the record for summary judgment purposes.

Mabrey, an Oklahoma bank, owns ATMs which dispense cash through the use of debit and credit cards.[45]  All of the cash held within Mabrey's ATMs is owned by TransFund, a third-party service provider responsible for processing Mabrey's ATM transactions.[46]  Everest, an insurance company, issued Mabrey the Financial Institution Bond No. 8100006380-181 (the Policy), for which Mabrey paid the premium, with an effective coverage period of July 15, 2018 through July 15, 2021.[47]  Mabrey paid Everest an additional premium for added coverage under an ATM Rider.[48]

---

[42] ECF 64 at 3.

[43] *See Doe v. City of Albuquerque*, 667 F.3d 1111, 1122 (10th Cir. 2012) (internal quotations and citation omitted).

[44] *See* Fed. R. Civ. P. 56(c); 28 U.S.C. § 1746; *see also Vazirabadi v. Denver Health and Hosp. Auth.*, 782 F. App'x 681, 687–88 (10th Cir 2019).

[45] ECF 39 at 5.

[46] ECF 49-1, *Second Affidavit of Asa Adamson* ¶¶ 6–7.

[47] ECF 39 at 5–6.

[48] *Id.* at 6.

In 2018, thieves made multiple unauthorized withdrawals of cash out of non-Mabrey accounts, using Mabrey ATMs, under what is known as a "cash-out" scheme.[49]  A cash-out scheme involves attaching a "skimming device" to a machine that accepts debits cards in order to capture the bank account information on those cards.[50]  The thieves then use the captured bank account information to create counterfeit cards and steal money from ATMs.[51]

The legal responsibility for the theft was shifted to Mabrey by TransFund under a "liability shift," which transfers liability from the financial entity issuing the card to the owner of the ATMs where the card is used.[52]  The shift in liability is triggered when thieves use counterfeit EMV (Europay, Mastercard, and Visa) cards to steal money from ATMs not equipped with EMV chip readers, and the accountholder reports this fraud to their card issuer.[53]  The parties do not dispute that the unauthorized withdrawals from Mabrey ATMs were made using counterfeit EMV cards and none of the ATMs were equipped with chip readers.[54]

On September 20, 2018, Mabrey became aware of discarded withdrawal slips in an ATM drive-thru and reported unauthorized debit card transactions to the Tulsa Police Department.[55]  The police report stated Mabrey was a victim of "fraudulent ATM transactions," was "willing to prosecute," and had learned "counterfeit cards were being used."[56]  In an October 17, 2018 email, Mabrey's Vice President and Security Officer, Tony Huerta, notified Mabrey's Senior

---

[49] *Id.* at 6–7.

[50] *Id.* at 7.

[51] *Id.*

[52] *Id.*; ECF 46 at 6–7; ECF 62 at 1–2.

[53] ECF 62 at 2; ECF 64 at 2–3; *see also* ECF 62-2, *Exhibits to Declaration of Michael Keeley* at 32.

[54] ECF 62 at 2; ECF 64 at 2–3; *see also* ECF 62-2 at 57.

[55] ECF 50 at 2; ECF 50-1 at 1.

[56] ECF 46 at 6.

Vice President of Operations, Asa Adamson, and Executive Officers Carlisle Mabrey IV (C. Mabrey) and Pam Phillips of the police reports and unauthorized withdrawals.[57]  He advised them that Mabrey had received multiple ATM disputes "that are definitely related to the fraud."[58] The same day, Adamson contacted Mary Rankin with TransFund and was told Mabrey was liable for any theft from ATMs without chip readers under the liability shift.[59]

On November 19, 2018, Mabrey received calls from other banks notifying them of additional legitimate account holders disputing unauthorized withdrawals at Mabrey ATMs.[60] On December 17, 2018, Adamson, Huerta, and C. Mabrey received email notice from Rankin of "Mabrey Bank's ATM liability shift losses for Sept – Nov 2018."[61]  Rankin notes, "I know you're well on your way for upgrading the ATM's [sic] so this madness will soon be over."[62]

Mabrey notified Everest of the potential insurance claim on January 17, 2019, submitted a Proof of Loss on March 5, 2019, and a supplemental Proof of Loss on May 6, 2019.[63]  Everest denied the claim in a letter dated July 29, 2019, and then again on September 20, 2019, on the bases that coverage under Insuring Agreement (B) and the ATM Rider was precluded by Exclusion (k) and Mabrey failed to supply Everest with timely notice of the discovered loss as required under the Policy.[64]

---

[57] ECF 62-2 at 34–38.

[58] ECF 62 at 4–5; *see also* ECF 62-2 at 38.

[59] ECF 62 at 5; *see also* ECF 62-2 at 35–38, 62.

[60] ECF 39 at 7; *see also* ECF 39-1, *Affidavit of Asa Adamson* ¶ 5.

[61] ECF 39-2 at 1; *see also* ECF 39 at 7; ECF 62 at 3.

[62] ECF 39-2 at 1.

[63] ECF 39 at 8; ECF 46 at 7.

[64] ECF 39 at 8; ECF 46 at 10; *see also* ECF 39-9, *Denial of Coverage*; ECF 39-11, *Reaffirmed Denial of Coverage*.

On October 28, 2019, Mabrey initiated this suit asserting Everest breached its obligations under the Policy by refusing to indemnify Mabrey's claimed losses.[65]  Everest responded that it was justified in denying coverage of the claim and it did not breach its obligations under the Policy.[66]  On February 26, 2020, Mabrey filed its Motion for Summary Judgment.[67]  And in April, Everest filed its Cross-Motion for Summary Judgment[68] followed by its Supplemental Motion for Summary Judgment in July.[69]

In moving for Summary Judgment, Mabrey asserts coverage under three provisions of the Policy: (1) Insuring Agreement (B), (2) the ATM Rider, and (3) the "COVERED PROPERTY" provision.[70]

First, Insuring Agreement (B) covers:

[L]oss of items enumerated in the definition of Property resulting directly from: (a) robbery, burglary, misplacement, mysterious unexplainable disappearance and damage thereto or destruction thereof, or (b) theft, false pretenses, common-law or statutory larceny, committed by a person physically present in an office or on the premises of the Insured at the time the enumerated items of Property are surrendered.[71]

As defined by the Policy, "Property" includes money.[72]

 Second, the ATM Rider covers:

Loss of Property resulting directly from robbery, burglary, theft, damages thereto or destruction thereof involving automated mechanical devices located anywhere .

---

[65] ECF 5.

[66] *See* ECF 44.

[67] ECF 39.

[68] ECF 46.

[69] ECF 61; ECF 62.

[70] ECF 39 at 10–11.

[71] ECF 39-3 at 3.

[72] *Id.* at 10.

. . which on behalf of the Insured disburse Money, accept deposits, cash checks, drafts or similar written instruments or make credit card loans.[73]

The same Policy definitions apply, which include money in the definition of Property.[74]

Third, while Mabrey initially lists the "COVERED PROPERTY" provision as providing coverage,[75] later briefing establishes that both parties agree this provision does not provide coverage, but rather delineates the scope of coverage.[76]

Everest contends coverage is not proper because the loss sustained was not a "direct loss" within the coverage of Agreement (B) and the ATM Rider; the claim was excluded by Exclusions (k), (v), and (t); and regardless of coverage, Mabrey failed to provide timely notice of the loss as required by the Policy.[77]

Exclusion (k) of the Policy excludes:

[L]oss resulting directly or indirectly from the use, or purported use, of credit, debit, charge, access, convenience or other cards (1) in obtaining credit or funds, or (2) in gaining access to automated mechanical devices which, on behalf of the Insured disburse Money, accept deposits, cash checks, drafts or similar Written instruments or make credit card loans, . . . whether such cards were issued, or purport to have been issued, by the Insured or by anyone other than the Insured . . .[78]

Exclusion (v) of the Policy excludes "indirect or consequential loss of any nature including, but not limited to, fines, penalties, multiple or punitive damages."[79]

---

[73] *Id.* at 51.

[74] *Id.* at 10.

[75] ECF 39 at 10–11.  The "COVERED PROPERTY" provision states, "[t]his bond shall apply to loss of Property (a) owned by the Insured, (b) held by the Insured in any capacity, or (c) owned and held by someone else under circumstances which make the Insured responsible for the Property prior to the occurrence of the loss." ECF 39-3 at 17.

[76] *See* ECF 45 at 16; ECF 49 at 2.

[77] ECF 46 at 10–11; ECF 62 at 5–8.

[78] ECF 39-3 at 12.

[79] *Id.* at 13.

Exclusion (t) of the Policy excludes "damages of any type for which the Insured is legally liable, unless the Insured establishes that the act or acts which gave rise to the damages involved conduct which would have caused a covered loss to the Insured in a similar amount in the absence of such damages."[80]

Lastly, the Policy provides Conditions and Limitations including:

Section 3.  This bond applies to loss first discovered by an Executive Officer during the bond period.  *Discovery occurs when an Executive Officer first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by the bond has been or will be incurred*, regardless of when the act or acts causing or contributing to such loss occurred, *even though the exact amount or details of the loss may not be known*.  Discovery also occurs when an Executive Officer receives notice of an actual or potential claim in which it is alleged that the Insured is liable to a third party under circumstances which, if true, would constitute a loss under this bond.
. . .
Section 5 (a).  At the earliest practicable moment, not to exceed thirty (60) [sic] days after discovery of loss, an Executive Officer shall give the Underwriter notice thereof.[81]

Executive Officer is defined by the Policy as "the Chairman of the Board, Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Director, In-house Counsel, Controller, Internal Auditor, Risk Manager, Senior Loan Officer or President of the Insured or any person holding any equivalent positions within the Insured."[82]

### III.    Procedural History

On October 28, 2019, Mabrey Bancorporation, Inc. filed its Complaint, asserting Everest breached its obligations under the Policy.[83]  On December 11, 2019, Everest filed its Answer to

---

[80] *Id.*

[81] *Id.* at 26 (emphasis added).

[82] *Id.*

[83] ECF 5.

the Complaint[84] and a Third-Party Complaint against Mabrey Bank.[85]  On January 17, 2020, Mabrey Bancorporation, Inc. filed a Motion to Join Mabrey Bank as Plaintiff.[86]  The court granted the Joinder of Parties[87]  and, on April 1, 2020, Everest amended its Answer.[88]

On February 26, 2020, Mabrey filed its Motion for Summary Judgment.[89]  On April 1, 2020, Everest filed its Cross-Motion for Summary Judgment.[90]  And on July 21, 2020, Everest filed a Supplemental Motion for Summary Judgment and Supplemental Response to Plaintiff's Motion for Summary Judgment.[91]  This case was reassigned to the undersigned on June 30, 2021.[92]  The motions having been fully briefed, oral argument was heard on April 12, 2022.[93]

For the reasons described herein the court now GRANTS Everest's Supplemental Motion for Summary Judgment and DENIES Mabrey's Motion for the same.  Everest's First Motion for Summary Judgment is DENIED as moot.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law."[94]  A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the

---

[84] ECF 16.

[85] ECF 18.

[86] ECF 29.

[87] ECF 37.

[88] ECF 44.

[89] ECF 39.

[90] ECF 46.

[91] ECF 61; ECF 62.

[92] ECF 67.

[93] ECF 70, *Minutes of Proceedings on April 12, 2022*.

[94] Fed. R. Civ. P. 56(a).

evidence is such that a reasonable jury could return a verdict for the nonmoving party."[95]

"Judgment as a matter of law is appropriate when the nonmoving party has failed to make a

sufficient showing on an essential element of [its] case with respect to which [it] has the burden

of proof."[96]  When applying this standard, the court is to "view the evidence and make all

reasonable inferences in the light most favorable to the nonmoving party."[97]  "Cross-motions for

summary judgment are to be treated separately; denying one does not require granting

another."[98]

     If the moving party does not have the ultimate burden of persuasion at trial, that party

"has both the initial burden of production … and the burden of establishing that summary

judgment is appropriate as a matter of law."[99]  A moving party "may carry its initial burden

either by producing affirmative evidence negating an essential element of the non-moving party's

claim, or by showing that the nonmoving party does not have enough evidence to carry its

burden of persuasion at trial."[100]

     On the other hand, if the moving party has the burden of proof at trial, "a more stringent

summary judgment standard applies."[101]  A moving party bearing the burden of proof "cannot

force the nonmoving party to come forward with specific facts showing there is a genuine issue

for trial merely by pointing to parts of the record that it believes illustrate the absence of a

---

[95] *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

[96] *Doe*, 667 F.3d at 1122 (internal quotations and citation omitted).

[97] *N. Nat. Gas Co. v. Nash Oil & Gas, Inc*., 526 F.3d 626, 629 (10th Cir. 2008).

[98] *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

[99] *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008).

[100] *Id.*

[101] *Id.*

genuine issue of material fact."[102]  Rather, "the moving party must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case."[103]

## ANALYSIS

Each side asks the court to declare as a matter of law whether Everest breached the Policy by denying coverage for Mabrey's insurance claim.  Mabrey initially asserts coverage under three distinct policy provisions[104] but, in subsequent briefing, relies exclusively on coverage provided by the ATM Rider.[105]  Mabrey argues the money stolen from the ATMs was covered under the ATM Rider because it was a loss of "property" resulting directly from theft involving ATMs that disbursed money on behalf of Mabrey.[106]

Everest responds that the claim is not covered for three reasons.[107]  First, Mabrey failed to submit timely notice of the potential claim as required by the Policy's plain terms.[108]  Second, Mabrey's loss was an indirect loss, resulting from the liability shift, and therefore is not covered under the ATM Rider and is precluded from coverage under Insuring Agreement (B) by Exclusion (t) and (v).[109]  Third, coverage under the ATM Rider and Insuring Agreement (B) is precluded by Exclusion (k) because the enumeration of "credit, debit, . . . or other cards" should be interpreted to include counterfeit credit cards.[110]

---

[102] *Id.* (internal citations omitted).

[103] *Id.*

[104] ECF 39 at 10–11.

[105] *See, e.g.,* ECF 49 at 2; ECF 50 at 7.

[106] ECF 49 at 2–3.

[107] *See* ECF 46 at 10–11; ECF 62 at 5–10.

[108] ECF 62 at 8–10.

[109] *Id.* at 5–8.

[110] ECF 46 at 12–15.

As discussed below, regardless of whether coverage was otherwise triggered under Insuring Agreement (B) or the ATM Rider, Mabrey's notice was untimely.  Pursuant to the Policy, notice was required within 60-days of discovery of loss.  Additionally, Mabrey's untimely notice is not excused by application of the so-called 'notice-prejudice' exception. Accordingly, Everest properly denied coverage under the Policy and is entitled to summary judgment on that basis.[111]

## I.    Insurance Contract Interpretation Under Oklahoma Law

The Tenth Circuit has instructed that "[t]he interpretation of an insurance contract is governed by state law and, sitting in diversity, we look to the law of the forum state."[112]  The parties agree Oklahoma law applies based on their briefing and reliance on Oklahoma case law.[113]

Under Oklahoma law, insurance policies are construed "consistent with the object sought to be accomplished, so as to give a reasonable effect to all of [the] provisions, if possible."[114] The interpretation of insurance contracts, including the existence and resolution of any ambiguity, is a matter of law for the court to resolve.[115]  If the policy language is clear, consistent, and unambiguous on its face, then the terms are accepted in their plain and ordinary meaning.[116]  However, if the policy language is ambiguous, meaning it is susceptible to two plausible constructions, it will be interpreted in favor of the insured while remaining consistent

---

[111] The court declines to express an opinion on the parties' other arguments, which are rendered moot by Mabrey's failure to provide timely notice—a condition precedent to coverage under the Policy.

[112] *Hous. Gen. Ins. Co. v. Am. Fence Co.*, 115 F.3d 805, 806 (10th Cir.1997).

[113] *See, e.g.,* ECF 39 at 12; ECF 46 at 12.

[114] *Dodson v. St. Paul Ins. Co.*, 812 P.2d 372, 376 (Okla. 1991).

[115] *Id.*

[116] *BP Am., Inc. v. State Auto Prop. & Cas. Ins. Co.*, 148 P.3d 832, 835 (Okla. 2005) (citing *Dodson*, 812 P.2d at 376).

with the parties' intentions.[117]  That said, the court will not force or strain interpretation of a

policy in order to favor either party.[118]

## II.    Timely Notice Under the Policy

The parties dispute: 1) whether Mabrey provided timely notice; and 2) even if notice was

untimely under the Policy, whether that untimeliness must be excused.

First, Mabrey argues it provided notice to Everest within sixty days of its Executive

Officers discovering the loss, as required by the Policy.[119]  It is undisputed that Everest received

notice of Mabrey's claim on January 17, 2019.[120]  Mabrey asserts discovery of loss occurred on

December 17, 2018, after Executive Officers received notice from TransFund of Mabrey's initial

responsibility for ATM liability shift losses.[121]  Alternatively, Mabrey argues discovery occurred

on November 19, 2018, after multiple banks notified Mabrey of account holders disputing

fraudulent withdrawals from their ATMs.[122]  Everest counters that discovery occurred on

October 17, 2018, outside the sixty-day notice period, when Executive Officers were notified of

fraudulent transactions, made aware of ATM disputes related to the fraud, and spoke with

TransFund about application of the liability shift.[123]  As discussed in detail below, the court

agrees with Everest and concludes Mabrey's notice was untimely under the Policy.

Mabrey nevertheless contends that even if notice was untimely, the late notice should be

excused under the so-called 'notice-prejudice' exception to strict compliance with policy notice

---

[117] *Dodson*, 812 P.2d at 376–77.

[118] *Id.* at 376; *see also BP Am., Inc.*, 148 P.3d at 835 ("This court may not rewrite an insurance contract to benefit either party.").

[119] *See* ECF 39 at 13–15; ECF 64 at 6–8.

[120] *See* ECF 39 at 14; ECF 62 at 10.

[121] ECF 39 at 14; ECF 39-2 at 1.

[122] ECF 39 at 14.

[123] ECF 62 at 9; ECF 62-2 at 34–38.

requirements, because Everest was not prejudiced by the allegedly late notice.[124]  The court is

unpersuaded by Mabrey's argument for this novel application of Oklahoma's notice-prejudice

exception to financial institution bonds such as the Policy.  Rather, as Everest counters, timely

notice is a condition precedent to coverage.  A showing of prejudice, as required by the notice-

prejudice exception, is inapplicable to financial institution bonds such as the Policy at issue here.

### a.  Mabrey's Notice of Loss was Untimely Under the Policy

The first issue is whether Mabrey's notice to Everest on January 17, 2019, was timely in

view of the requirements of the Notice of Loss or Potential Claim provision of the Policy.[125]

This provision requires Mabrey to notify Everest of any loss within sixty days of its

"discovery."[126]  Under the Policy terms,

> Discovery occurs when an Executive Officer first becomes aware of facts which
> would cause a reasonable person to assume that a loss of a type covered by the bond
> has been or will be incurred, regardless of when the act or acts causing or
> contributing to such loss occurred, even though the exact amount or details of the
> loss may not be known.[127]

The parties do not argue there is any ambiguity in the Policy language regarding these terms,

therefore the Policy definition of "discovery" is accepted in its plain and ordinary sense.

Mabrey argues discovery of the loss occurred on December 17, 2018, after Adamson and

C. Mabrey became aware of Mabrey's initial ATM liability shift losses from TransFund.[128]

Alternatively, Mabrey argues discovery occurred on November 19, 2018, after multiple banks

notified Mabrey that legitimate account holders were disputing unauthorized withdrawals from

---

[124] ECF 39 at 14–15; ECF 64 at 6–8.

[125] ECF 39-3 at 26.

[126] *Id.*  The original policy language reads, "not to exceed thirty (60) days."  The parties stipulate this error is
resolved to require notice within sixty (60) days.  *See* ECF 39 at 13 n.2; ECF 62 at 8.

[127] ECF 39-3 at 26.

[128] ECF 39 at 14; ECF 39-2 at 1.

Mabrey ATMs.[129]  Under either of those dates, Mabrey's January 17, 2019, notice would be timely under the Policy.  However, Everest contends discovery of loss occurred on October 17, 2018, after C. Mabrey, Phillips, and Adamson were informed of account holders disputing unauthorized withdrawals from Mabrey ATMs and of the potential for liability under the liability shift with TransFund.[130]

Where the material facts are undisputed, timeliness of notice and the related question of when discovery of loss occurred are questions of law for the court to decide.[131]  Here, the parties do not dispute the material facts.  Therefore, the questions of when discovery of loss occurred and whether the subsequent notice was timely are questions of law appropriate for summary judgment.  The question of when discovery occurred hinges on when Mabrey Executive Officers learned facts that would cause them to reasonably believe a loss covered by the Policy had been or would be incurred.  Under the liability shift, Mabrey is liable for unauthorized withdrawals if thieves used counterfeit EMV cards to steal money from ATMs not equipped with EMV chip readers and the accountholders report this fraud to their card issuer.[132]  Therefore, Mabrey's Executive Officers knew or should have known liability would ensue once they became aware of ATM disputes related to fraudulent transactions at ATMs without chip readers.

Mabrey's Executive Officers reasonably became aware that Mabrey would be held liable for the unauthorized transactions under the liability shift on October 17, 2018.  First, Executive Officers Phillips, C. Mabrey, and Adamson received an email from Huerta notifying them of fraudulent ATM transactions using "non Mabrey Bank cards," and of account holder disputes

---

[129] ECF 39 at 14.

[130] ECF 62 at 9; ECF 62-2 at 37–38.

[131] *See, e.g.*, *Alfalfa Elec. Co-op., Inc. v. Travelers Indem. Co.*, 376 F. Supp. 901, 906–08 (W.D. Okla. 1973).

[132] ECF 62-2 at 32, 35–37; ECF 62 at 2.

that were "definitely related to this fraud."[133]  Second, Adamson spoke with Rankin at

TransFund and was notified that Mabrey would be liable under the liability shift for any

successful, fraudulent transactions occurring at ATMs without chip readers.[134]  It is undisputed

that Philips, Adamson, and C. Mabrey are all Executive Officers pursuant to the Policy

definition.[135]  It is also undisputed that none of Mabrey's ATMs targeted by the cash-out scheme

were equipped with chip readers.[136]  Because Mabrey was aware of liability under the liability

shift for fraudulent transactions involving ATMs without chip readers and knew that fraudulent

transactions had occurred and were being disputed, it should have reasonably known a loss

covered by the Policy had been or would be incurred.

Mabrey contends the knowledge of account holder disputes on October 17, 2018, did not

constitute a discovery of loss because it is common for disputes to be withdrawn when a

cardholder realizes the transaction was made by someone with permission to do so.[137]  However,

Huerta's email stating the disputed withdrawals were "definitely related to this fraud" directly

contradicts this argument.[138]  Mabrey was aware the disputes were related to the fraud and not

simply a mistake.  It does not matter that Mabrey was not aware of the full extent of loss or later

learned of additional disputed transactions because discovery under the Policy occurs "even

---

[133] ECF 62-2 at 34-38; ECF 62 at 4–5.

[134] ECF 62 at 5; *see also* ECF 62-2 at 37-38 (October 17, 2018 email from Huerta to Adamson stating, "Mary Rankin said that for any ATM that does not have EMV the bank is liable for any successful transactions."); *Id.* at 62; (Memorandum from Adamson to John C. Cullen dated February 14, 2019, stating, "[w]e initiated a call with our ATM servicer, TransFund, on October 17[.] . . .  Our servicer told us our bank could have liability if the cards used we[re] EMV chip cards because our terminals we[re] not EMV capable.").

[135] *See* ECF 62 at 4; ECF 64 at 2–3; *see also* ECF 39 at 14; ECF 45 at 19.

[136] ECF 62 at 2; ECF 64 at 2–3.

[137] ECF 64 at 6.

[138] ECF 62-2 at 34-38; ECF 62 at 4–5.

though the exact amount or details of the loss may not be known."[139]  It is enough that Mabrey

was aware on October 17, 2018, of the liability shift and of some account holders disputing ATM

withdrawals related to fraudulent transactions at ATMs without chip readers.

Accordingly, Mabrey failed to satisfy the timely notice requirements under the Policy.

Per the notice provision, it was required to give notice within sixty days of discovering that a loss

covered by the Policy had occurred or would occur.  Mabrey discovered a covered loss on

October 17, 2018, after Executive Officers became aware of disputes regarding fraudulent

transactions and were notified of application of the liability shift and resulting loss for any

fraudulent transactions involving non-EMV processing ATMs.  Because timely notice is a

condition precedent to coverage under the Policy and Mabrey failed to satisfy that condition,

Everest owes no duty to indemnify Mabrey for its losses. [140]

### b. The Notice-Prejudice Exception Does Not Apply to the Policy

Mabrey argues even if its notice was untimely, the court should apply the so-called

'notice-prejudice exception' to conclude that under the circumstances of this case, its

untimeliness is excused.  Everest counters that Oklahoma has confined application of the notice-

prejudice exception to certain liability policies and has expressly rejected its application to

claims-made policies.[141]  Everest argues for strict enforcement of the Policy's notice

requirements based on the Policy's similarity to a claims-made policy and persuasive precedent

from other jurisdictions rejecting the application of the notice-prejudice exception to financial

---

[139] ECF 39-3 at 26.

[140] Under Oklahoma law, timely notice is "unquestionably a condition precedent to coverage… [such that] no liability attaches unless the specified notice is given." *Alfalfa Elec. Co-op., Inc.*, 376 F. Supp. at 908 (citing *U.S. Fid. & Guar. Co. v. Gray*, 233 P. 731, 733 (Okla. 1925)).

[141] *See* ECF 65 at 3–4.

institution bonds.[142]  The court agrees with Everest and, for the reasons explained below, declines to extend the notice-prejudice exception to financial institution bonds such as the Policy.

The issue of whether the notice-prejudice exception applies to financial institution bonds, like the Policy, is an issue of first impression under Oklahoma law.[143]  "Where the state's highest court has not addressed the issue presented, the federal court must determine what decision the state court would make if faced with the same facts and issue."[144]  In doing so, the court may consider decisions from lower Oklahoma courts, decisions from other states with similar legal principles, and federal decisions interpreting Oklahoma law.[145]

Following these principles, the court concludes the notice-prejudice exception does not apply to the Policy at issue for three reasons: (1) the public policy rational underlying Oklahoma's notice-prejudice exception is inapplicable where the Policy was not designed to indemnify Mabrey for harms caused to the public; (2) Oklahoma has expressly rejected application of the notice-prejudice exception to claims made policies, which other jurisdictions have persuasively analogized to financial institution bonds, like the Policy; and (3) all parties are sophisticated and fairly negotiated the terms of the contract such that they do not need protection from strict enforcement.  The court will discuss these reasons in turn.

---

[142] *See id.* at 4–5.

[143] In fact, this court is aware of only a few cases that consider whether the notice-prejudice exception is applicable to financial institution bonds.  *See, e.g., F.D.I.C. v. Ins. Co. of N. Am.*, 105 F.3d 778, 786–87 (1st Cir. 1997); *Centrix Fin. Liquidating Tr. v. Nat'l Union Fire Ins. Co. of Pittsburgh (In re Centrix Fin., LLC)*, No. 09-CV-01542-PAB-CBS, 2015 WL 3499853, at *4 (D. Colo. June 2, 2015) (unpublished); *ABCO Premium Fin. LLC v. Am. Int'l Group, Inc.*, No. 11-23020-CIV, 2012 WL 3278628 at *9 (S.D. Fla. Aug. 9, 2012) (unpublished); *State Bank of Viroqua v. Capitol Indem. Corp.*, 214 N.W.2d 42, 710 (Wis. 1974).  *But see, e.g., MBP Collection LLC v. Everest Nat'l Ins. Co.*, No. CV-17-04022, 2019 WL 110978, at *3 (D. Ariz. Jan. 4, 2019) (unpublished); *Nat'l Union Fire Ins. Co. of Pittsburgh, Penn. v. F.D.I.C.*, 957 P.2d 357, 368 (Kan. 1998).

[144] *Black & Veatch Corp. v. Aspen Ins. (Uk) Ltd.*, 882 F.3d 952, 957 (10th Cir. 2018) (internal quotations and citation omitted).

[145] *Sinclair Wyo. Refining Co. v. A&B Builders, Ltd.*, 989 F.3d 747, 766 (10th Cir. 2021) (citations omitted).

### i.    The Policy does not protect injured third-party members of the public

While Oklahoma law generally requires timely notice as a condition precedent to coverage, in some circumstances "an insurer must also demonstrate prejudice from lack of notice."[146]  In discussing this exception, the Oklahoma Supreme Court explained the policy of strictly enforcing notice provisions should not apply with equal force where: (1) the insurance policy protects not only the insured but also members of the public, and (2) the insurer had actual notice "in time to adequately investigate [the claim] and protect its legal rights."[147]  Insurance policies indemnifying insureds for events harming the public, such as public liability insurance or automobile liability insurance, fall into this category.[148]

To illustrate, Oklahoma courts have applied the notice-prejudice exception to automobile insurance policies relying in part on Oklahoma's compulsory liability insurance statute which "embodies 'a public policy that innocent victims of the negligent operation of motor vehicles should be compensated for their injuries.'"[149]  Expanding on this, the Oklahoma Court of Civil Appeals found insurance policy provisions "which operate to deny coverage to the general public are void as contrary to statutorily articulated public policy."[150]

---

[146] *Thames v. Evanston Ins. Co.*, No. 13-CV-425-PJC, 2015 WL 7272214 at *5 (N.D. Okla. Nov. 17, 2015) (unpublished), *aff'd*, 665 F. App'x 716 (10th Cir. 2016) (citing *Fox v. Nat'l Sav. Ins. Co.*, 424 P.2d 19, 25 (Okla. 1967)).

[147] *Fox*, 424 P.2d at 24.

[148] *Id.* at 25.

[149] *Baldridge v. Kirkpatrick*, 63 P.3d 568, 571 (Okla. Civ. App. 2002) (quoting *Hartline v Hartline*, 39 P.3d 765, 770 n.15 (Okla. 2001)); *see also* Okla. Stat. Ann. 47 § 7-601(A) (requiring that every owner or operator of a vehicle registered in Oklahoma maintain liability insurance coverage).

[150] *Baldridge*, 63 P.3d at 571 (quoting *Hartline*, 39 P.3d at 771).

In its briefs, Mabrey cites four cases in which Oklahoma courts have applied the notice-prejudice exception.[151]  Three of those cases involve automobile liability insurance policies.[152]  The fourth involves a professional liability insurance policy.[153]  The common denominator among them is the insurance policies at issue indemnified the insured for events harming third-party members of the public.

Highlighting similar policy rationales and the "material technical and substantive differences between a financial institution bond and liability insurance," the First Circuit Court of Appeals declined to extend Massachusetts' notice-prejudice exception for liability insurance to financial institution bonds.[154]  The court of appeals found the justifications for applying the notice-prejudice exception to liability insurance policies were inapplicable to financial institution bonds which do not extend to protect third-party members of the public and are not contracts of adhesion.[155]

Oklahoma's public policy reasons for adopting the notice-prejudice exception are likewise inapplicable to the Policy at issue in this case.[156]  As an initial matter, unlike automobile liability insurance, there is no statutory support for application of the notice-prejudice exception to financial institution bonds.  The Oklahoma Court of Civil Appeals has explained, "in the absence of express statutory provision to the contrary, failure to give notice . . . constitutes a

---

[151] ECF 39 at 15; ECF 64 at 6–7.

[152] *Fox*, 424 P.2d at 20; *Indep. Sch. Dist. No. 1 of Tulsa Cnty. v. Jackson*, 608 P.2d 1153, 1154 (Okla. 1980); *Baldridge*, 63 P.3d at 569.

[153] *Thames*, 2015 WL at * 1.

[154] *Ins. Co. of N. Am.*, 105 F.3d at 786.

[155] *Id.* at 786–87.

[156] *See, e.g.*, *Fox*, 424 P.2d at 24; *Baldridge*, 63 P.3d at 571.

good defense to an action by an injured member of the public against the insurer under a voluntary liability insurance policy."[157]

Unlike cases in which Oklahoma courts have applied the notice-prejudice exception, the Policy expressly does not indemnify Mabrey for damages caused to members of the public.[158] Exclusion (t) precludes coverage for "damages of any type for which the Insured is legally liable, unless the Insured establishes that the act or acts which gave rise to the damages involved conduct which would have caused a covered loss to the Insured in a similar amount in the absence of such damages."[159]  Additionally, the requirement that the loss be "direct," as stated in the ATM Rider and Exclusion (v), makes clear that the Policy was meant to insure against harms to Mabrey, not harms to the public caused by Mabrey.[160]

There is no statutory support to justify extending the notice-prejudice exception to financial institution bonds.  And, since the Policy does not compensate for damages caused to third parties, doing so would not advance Oklahoma's public policy of protecting injured members of the public.  The court finds no justification for extending the notice-prejudice exception to financial institution bonds based on Oklahoma's application of the exception to automobile and certain other liability policies.

### ii.    The Policy is functionally analogous to a claims made policy

Oklahoma courts have expressly rejected application of the notice-prejudice exception to claims made policies.[161]  In contrast to 'occurrence' policies, for which coverage is triggered by

---

[157] *Baldridge*, 63 P.3d at 572.

[158] *See e.g.*, *Fox*, 424 P.2d at 24–25; *Indep. Sch. Dist. No. 1 of Tulsa Cnty.*, 608 P.2d at 1154; *Baldridge*, 63 P.3d at 571-72; *Thames*, 2015 WL 7272214 at *1.

[159] ECF 39-3 at 13.

[160] *Id.* at 13, 51.

[161] *State ex rel. Crawford v. Indem. Underwriters Ins. Co.*, 943 P.2d 1099, 1102 (Okla. Civ. App. 1997).

insurable events occurring during the policy term, under claims made policies "coverage is only triggered when, during the policy period, an insured becomes aware of and notifies the insurer of either claims against the insured or occurrences that might give rise to such a claim."[162] By eliminating potential "tail liability," where an insurer may be liable for claims or losses discovered long after the policy period ends but traceable to events during the policy period, claims made policies "reduce[] the potential exposure of the insurer, thus reducing the policy cost to the insured."[163]

Oklahoma courts have held that application of the notice-prejudice exception to claims made policies would undo this cost-saving.[164] "[A]llowing actual notice beyond the policy period would constitute an unbargained for expansion of coverage, gratis, resulting in the insurance company's exposure to a risk substantially broader than that expressly insured against in the policy."[165] Therefore, based on the relationship of coverage to the timing of notice under claims made policies, the court held an "insurance company does not have to show it was prejudiced by a late notice."[166]

---

[162] *Id.* at 1100 (citing *Laforge v. Am. Cas. Co. of Reading Pa.*, 37 F.3d 580, 583 (10th Cir. 1994)).

[163] *Chandler v. Valentine*, 330 P.3d 1209, 1212 (Okla. 2014) (internal quotations and citations omitted); *see also Assn. of Cnty. Comm'rs of Okla. v. Nat'l Am. Ins. Co.*, 116 P.3d 206, 211 (Okla. Civ. App. 2005) (noting claims made policies were "developed to reduce the premium costs for liability coverage where the claim might not be known until years after an occurrence") (internal citations omitted).

[164] *Assn. of Cnty. Comm'rs of Okla.*, 116 P.3d at 211 (citing *Slater v. Lawyers' Mut. Ins. Co.*, 278 Cal. Rptr. 479, 483–84 (Cal. Ct. App. 1991)).

[165] *State ex rel. Crawford*, 943 P.2d at 1102 (citing *Laforge*, 37 F.3d at 583) (internal quotations omitted).

[166] *Id.*; *see also Assn. of Cnty. Comm'rs of Okla.*, 116 P.3d at 211 ("Because of the importance of the date of notice in a claims made policy, it has been held that the rule that late notice is acceptable where the insurer has not been prejudiced is inapplicable to claims made policies.") (internal citations omitted). Mabrey characterizes *Assn. of Cnty. Comm'rs of Okla.* as standing for the proposition that strictly enforcing notice provisions in claims made policies is the "exception to the rule that the insurer must show prejudice" and the insurer is only excused from the requisite showing of prejudice "where notice of the claim is not given to the insurer *during the policy period*." ECF 64 at 8 (emphasis in original). This characterization is incorrect and in contradiction with *Assn. of Cnty. Comm'rs of Okla.* and *State ex rel. Crawford* which explicitly hold the notice-prejudice exception is inapplicable to claims made policies, without caveat.

While Oklahoma has not specifically analogized financial institution bonds to claims made policies, other jurisdictions have highlighted their similarities in rejecting the application of the notice-prejudice exception to financial intuition bonds.[167]  For example, the District of Colorado declined to extend application of the notice-prejudice exception to financial institution bonds based on their substantive similarity to claims made policies.[168]  Colorado, like Oklahoma, had explicitly declined to apply the notice-prejudice exception to claims made policies.[169]  The court noted the bonds, like claims made policies, "cover[] events discovered within the policy term, regardless of when the acts occur[]," terminate at the expiration of the bond period, and require notice "within the policy period or a defined reporting period."[170]  Additionally, the public policy reasons behind the notice-prejudice exception, such as "the adhesive nature of the contract, the public's interest in compensating tort victims, and the inequity of an insurer[] receiving a windfall from a technicality" were not applicable to financial institution bonds.[171] The District of Colorado found no justification for applying the notice-prejudice exception when doing so would materially alter the contract.[172]

---

[167] *See, e.g., in re Centrix Fin., LLC*, 2015 WL at *4; *ABCO Premium Fin. LLC*, 2012 WL at *9 (holding a requirement of prejudice from late notice "is not applicable to a claims-made or discovery policy such as the financial bond that was issued to ABCO").  *But see MBP Collection LLC*, 2019 WL at *3 (holding financial institution bonds were discovery policies to which Arizona's notice-prejudice rule applies).  The parties have not identified, and the court has not found, any precedent in Oklahoma distinguishing discovery policies from claims made policies.  This conforms with Oklahoma's general view that notice is unquestionably a condition precedent to coverage.  *See U.S. Fid. & Guar. Co.*, 233 P. at 733.

[168] *In re Centrix Fin., LLC*, 2015 WL 3499853, at *4.

[169] *Id.* at *2.

[170] *Id.* at *3.

[171] *Id.* at *4.

[172] *Id.* at *3 ("The date-certain notice requirement in a claims-made policy defines the temporal boundaries of the policy's basic coverage terms, and is therefore a material condition precedent to coverage… because the parties to claims-made policies agree to limit the insurer's risk to a defined policy term, applying the notice-prejudice rule to such a policy would alter a basic term of the insurance contract.") (internal citations omitted).

Although the Policy at issue is not a claims made policy, it is structurally analogous to a claims made policy.  Coverage is triggered under both the Policy and claims made policies when the insured becomes aware of a covered or potentially covered incident and notifies its insurer within the policy period or other defined reporting period.  Coverage under the Policy is based on when Mabrey discovers a covered loss and notifies Everest, not on when the underlying acts or occurrence causing the loss occurred.[173]  This aligns the Policy more with the structure of a claims made policy, for which Oklahoma has rejected application of the notice-prejudice exception, than with occurrence policies, such as the liability policies for which Oklahoma has applied the exception.  Like with claims made policies, application of the notice-prejudice exception to financial institution bonds such as the Policy would create an unbargained for expansion of coverage.[174]

The court is persuaded that the Policy at issue is more akin to the claims made policies, for which Oklahoma has refused to apply the notice-prejudice exception, than to the liability policies for which Oklahoma has applied the exception.  Thus, Oklahoma's rationale for rejecting application of the notice-prejudice exception to claims made policies—based on an interest in maintaining the cost savings achieved when coverage is tied to discovery and notice— is likewise applicable to rejecting its application to financial institution bonds.

### iii.    The Policy is not a contract of adhesion

Lastly, because financial institution bonds are not contracts of adhesion, any interest in mitigating harsh enforcement of contract terms against a party unable to negotiate is not implicated in their enforcement.  Fidelity bonds, including financial institution bonds, are "arms-

---

[173] *See* ECF 39-3 at 26 (stating that discovery occurs when an Executive Officer becomes aware of a covered loss, "regardless of when the act or acts causing or contributing to such loss occurred").

[174] *See, e.g., State ex rel. Crawford*, 943 P.2d at 1102; *Assn. of Cnty. Comm'rs of Okla.*, 116 P.3d at 211.

length, negotiated contract[s] between sophisticated business entities."[175]  "Over the years, the

banking industry and the fidelity bond companies have negotiated various standard forms of the

Financial Institution Bonds."[176]  This history of negotiation was noted by both the First Circuit

and the District of Colorado as support for declining to extend the notice-prejudice exception to

financial institution bonds.[177]

Here, both Mabrey and Everest were sophisticated business entities with power to fairly

negotiate the terms of the contract to maximize their own benefit under the Policy.  While the

Policy appears to be based on a form agreement,[178] its modification[179] as well as the negotiation

of the form itself between the banking and fidelity bond industries reinforces the conclusion that

the Policy is not a contract of adhesion.

Given the parties' sophistication, and Oklahoma law that timely notice is "unquestionably

a condition precedent to coverage,"[180] declining to extend the notice-prejudice exception to the

---

[175] *Ins. Co. of N. Am.*, 105 F.3d at 786; *see also State Bank of Viroqua*, 214 N.W.2d at 44 n.1 ("Financial Institution Bonds are the results of negotiations between the Surety Association of America . . . and various [banking] organizations representing the insureds.").

[176] *Ins. Co. of N. Am.*, 105 F.3d at 786 ("the standard form [ ] was drafted by the joint efforts of the Surety Association of America and the American Bankers Association."); *see also Calcasieu–Marine Nat'l Bank of Lake Charles v. Am. Emp'r Ins. Co.*, 533 F.2d 290, 295 n. 6 (5th Cir. 1976) ("[T]he banker's blanket bond being construed was drafted by a joint effort of the American Bankers' Association and the American Surety Association.").

[177] *See Ins. Co. of N. Am.*, 105 F.3d at 786-87 ("[T]o the extent the notice prejudice rule is supported by the policy of protecting consumers who effectively have little or no bargaining leverage, that policy provides no basis here to extend the notice prejudice rule."); *in re Centrix Fin., LLC*, 2015 WL at *4 ("The public policy concerns that prompted Colorado's adoption of the notice-prejudice rule in certain contexts—namely, the adhesive nature of the contract . . . and the inequity of an insurer[] receiving a windfall from a technicality—are not present here.").  *But see Nat'l Union Fire Ins. Co. of Pittsburgh, Penn.*, 957 P.2d at 358, 363, 368 (extending Kansas' generally applicable notice-prejudice rule to fidelity bonds' proof of loss requirement because "insurance contracts are not negotiated agreements," coverage does not "depend[] on satisfaction of a condition precedent," and the bonds at issue classified as discovery policies).

[178] *See* ECF 39-3 at 1 ("Standard Form No. 24, Revised to May, 2011").

[179] *See, e.g., in re Centrix Fin., LLC*, 2015 WL 3499853, at *4 ("[T]he bond is modified by seventeen different riders, which suggests that the parties were capable of negotiating the bond's terms.") (internal citation omitted).

[180] *Alfalfa Elec. Co-op., Inc.*, 376 F. Supp. at 908 (citing *U.S. Fid. & Guar. Co.*, 233 P. at 733).

Policy does not result in an unfair windfall to Everest.  The policy of protecting insureds from unfair terms they were unable to negotiate is not applicable under the circumstances of this case or, more generally, to financial institution bonds such as the Policy at issue.

In summary, the court declines to extend the notice-prejudice exception to financial institution bonds because Oklahoma's public policy rationale underlying the exception is inapplicable where the Policy was not designed to indemnify Mabrey for harms caused to the public; because of the similarity between the Policy and claims made policies, for which Oklahoma expressly rejects the notice-prejudice exception; and because both parties fairly negotiated the terms of the contract such that they do not need protection from unfair requirements.

## CONCLUSION

For the reasons stated, Everest's Supplemental Motion for Summary Judgment[181] is GRANTED and Mabrey's Motion for Summary Judgment is DENIED.[182]  Everest's First Motion for Summary Judgment is DENIED as moot.[183]  The parties have stipulated to dismissal of Everest's counterclaim,[184] and this order resolves both Mabrey's Complaint[185] and Everest's Third-Party Complaint.[186]  Accordingly, the Clerk of Court is directed to close the case.

//

//

---

[181] ECF 61.

[182] ECF 39.

[183] ECF 46.

[184] ECF 27.

[185] ECF 5.

[186] ECF 18.

SO ORDERED this 4th day of May 2022.

BY THE COURT:

_____

ROBERT J. SHELBY

United States Chief District Judge